# CHARLESTON.

## KERR *v.* HILL *et al.*

Submitted January 27, 1886.—Decided February 13, 1886.

1. If a trustee as such claims a growing crop of wheat, which in his absence another trustee as such takes possession of and commences cutting, the *cestui que trust* in the first deed may file a bill asking that the second trustee may be enjoined from selling the wheat, which he has cut, and for the appointment of a receiver and other appropriate relief; for in such a case a court of law could furnish no adequate relief for the wrong complained of, and a court of equity has jurisdiction. (p. 595.)

2. A deed of trust is given on a farm to secure a large debt, and the farm is advertised for sale by the trustee to pay such debt; the owner of the farm obtains an injunction to stay the sale, because, it is asserted, a large amount of usurious interest is included in the debt secured by the deed of trust; this injunction is dissolved

and suit dismissed agreed on the creditor's agreeing to purchase the farm and give the debtor eighteen months time to re-purchase it for a sum equal to the debt secured on it and interest, which is a fair price for the farm. The sale is made, and this arrangement carried into execution, the creditor getting an absolute deed for the farm, which he purchased at the public sale, and executing with the debtor an agreement giving the debtor an option to re-purchase the farm on the terms previously agreed upon, HELD :

This transaction does not amount to a mortgage ; and to justify a court in so regarding it very strong parol evidence would be required as well as other circumstances indicating clearly, that it was a mortgage ; for the circumstance, that the creditor held a deed of trust upon this farm, renders it in the highest degree improbable, that he could extend the time, in which the debt was to be paid, upon a mortgage on the same farm, nothing else being given to him. (p. 596.)

3. A growing crop of wheat is realty and under the statute of frauds can be sold only by a contract in writing. (p. 605.)

4. Where a trustee under an ordinary deed of trust to secure a debt sells land at a public sale, a crop of wheat growing upon it sowed by the owner of the land passes to the purchaser of the land, unless it was reserved ; but such reservation of it at such sale need not be in writing but may be proven by parol evidence. (p. 614.)

5. If before such sale there was an understanding between the owner of the land and a person, who, it was expected, would buy it at such public sale, that in making the purchase of the land he was not to get the growing crop of wheat, but that it should continue to be the property of the owner of the land, then such growing crop of wheat would not pass to such purchaser with the land, but it would after such sale continue to be the property of the former owner of the land, and such understanding need not be evidenced by any writing but may be proven by parol. (p. 614.)

6. Under sec. 28 of ch. 78 of Acts of 1882 (Warth's Code, p. 743) a judge of a circuit court ought not to appoint a receiver of real property or of the rents, issues or profits thereof in vacation. But if he should do so, the blunder should be corrected by making an order when the court is in session requiring such improperly appointed receiver to pay or pass over to the general receiver or to a special receiver appointed during the session of the court all money or property in his hands. (p. 616.)

*Simpson & Howard* for appellant.

*D. W. Polsley* for appellees.

73

Statement by GREEN, JUDGE:

The following are the facts out of which this chancery suit in the circuit court of Mason county originated. Henry P. Elias on March 17, 1881, executed to James B. Menager, trustee, a deed conveying two tracts of land adjoining each other on the Ohio river in said county containing together about 463 acres, to secure sundry notes which he owed to Peter S. Lewis amounting to a large amount. This deed of trust was duly recorded. Subsequently Elias, the grantor, died leaving by his will these two tracts of land thus encumbered to his sister Jane E. Hill. On Jan'y 23, 1885, she conveyed all the wheat then growing on these two tracts, being the wheat on about 170 acres of land, to A. W. Kernes, trustee, to secure a debt of $300.00 due September 1, 1885, which she owed to J. M. Kerr of Gallipolis, Ohio, the plaintiff, and to indemnify him as security for her in four several obligations specified in this deed of trust, which amount in all to $431.00 exclusive of interest and costs. This deed of trust was duly recorded January 31, 1885. Very shortly thereafter Menager, the trustee in the first deed of trust, was required by Lewis, the cestui que trust, to foreclose it; and he accordingly advertised the two tracts of land for sale to take place on February 16, 1885. The notes secured by this deed of trust were owned by Peter S. Lewis, but several of them were originally given to John McCulloch, who assigned them to Peter S. Lewis, and McCulloch may perhaps have been responsible for them as guarantor; but be this as it may, he felt an interest in the payment of these notes, which with principal and interest calculated up to June 6, 1885, would have amounted to $19,400.00.

After this land was advertised by the trustee for sale, Mrs. Jane E. Hill, most commonly called Jane E. Burns, applied to Lewis and McCulloch to extend to her a year's time, within which to pay this debt, promising within that time to sell this farm and pay off the debt; but they refused to extend to her this time. She then applied to them to give her six months' time, but they refused also to give her that time. It is probable that Lewis wanted this land sold, while this crop of wheat was growing upon it, as Lewis never supposed, that the land would sell for enough to pay off his

debt, and believed that whenever it was sold he would have to be the purchaser; but I suppose one of the objects of Jane E. Hill in asking this extension of six months' time, before the deed of trust should be foreclosed, was to enable the crop of wheat growing on it to be applied to the payment of the debts secured by the deed of trust on the wheat-crop, which she had given for the benefit of J. M. Kerr. For in this deed of trust she covenanted that "she was the true and lawful owner of this wheat-crop and had good right to sell and encumber the same, and that the same was free from encumbrances, and that she would warrant generally the title thereof."

As she could get no extension of time, she applied to counsel to obtain for her an injunction to prevent this sale. Her counsel were Wm. R. Gunn and John A. Gibbons, lawyers doing business under the firm name of Gunn & Gibbons, and D. S. VanMatre. These lawyers drew for her a bill of injunction and applied to the circuit court of Mason county then in session for the injunction. The awarding of it was resisted by the defendants, and affidavits were filed to prevent it. Before this controversy was decided, the day of sale, February 16, 1885, arrived; and as the court that day concluded to award the injunction and announced his decision, though the injunction-bond was not given till the next day, the sale was not made. A. A. Hanly went security on this injunction-bond. Mrs. Hill had first deposited with E. L. Neal as collateral security personal property probably worth $200.00 and had also executed a deed of trust primarily for his indemnity as such security on the same wheat-crop. In this second deed of trust E. L. Neal was trustee; and in it was included a grant of this 463 acres of land for one year, the rents of it during that time to be collected by this trustee and applied as the proceeds of the wheat-crop were to be applied as follows: first, to indemnify A. A. Hanly as her security in this injunction-bond, the penalty of which was only $200.00; secondly, to secure the reasonable fee of her attorneys in said injunction suit, Gunn & Gibbons and VanMatre, which in the progress of this cause were found to be worth $500.00; thirdly, to secure a note to said Gunn of $125.00 with interest from September 3, 1884; fourthly, to

indemnify said A. A. Hanly as endorser for her on a nego-
tiable note for $500.00 payable at the Ohio Valley Bank at
Gallipolis, which had been protested; fifthly, to secure a debt
due then from her to Ella B. Jenkins amounting to $350.00;
and sixthly, to secure a debt she then owed to Josiah Ar-
rington which amounted then to $350.00. This deed of trust
was recorded February 18, 1885, the day after it was given.

In this injunction-suit the counsel for the defendants were
J. B. Menager, the trustee in the deed of trust for Lewis's
benefit, and English and Polsley. The answers of the defen-
dants were filed promptly.

The principal ground, on which the injunction was asked,
was that in the notes secured by the deed of trust was in-
cluded a large amount of usurious interest.　On the filing of
the answer of the defendants the cause was at the February
term, 1885, of the circuit court of Mason county by a decree
referred to a commissioner to ascertain among other things
what amount, if any, of usury was included in these notes
held by Lewis and secured by this deed of trust. No deposi-
tions were taken and nothing done by the commissioner
under this order of reference, the suit having been dismissed
under a compromise at the next May term of said court;
but there is reason to believe, that there was about $1,400.00
of usurious interest included in the notes, the true amount due
to him being probably about $18,000.00 instead of $19,400.00.
Some time in March, 1885, Gunn one of the counsel of the
plaintiff, Jane E. Hill, made a proposition of compromise,
which was written out in pencil on a piece of paper and
handed to J. B. Menager, counsel for the defendant, Lewis.
This proposition was made without consultation with his cli-
ent, and it was left with Menager and has been lost.　Its con-
tents can not be given with much accuracy; but it is believed
from the testimony of Menager, the only witness who un-
dertakes to give any statement of its contents, that it provided
first for the dismissal of this chancery suit agreed at the first
term of the court thereafter; that the farm of 463 acres, if
purchased by the defendant, Lewis, as it was supposed it would
be, might at the option of Mrs. Hill be re-purchased of Lewis
in a certain time for a certain amount.　There was probably
in this proposition nothing said about what disposition should

be made of the growing crop of wheat.    It was but a memorandum in pencil of the basis of a compromise, though it was with some modification the substance of the compromise afterwards made.

This memorandum was probably never seen either by Lewis or Mrs. Hill.    The discussion about it was carried on by counsel in a number of conversations extending through several weeks; and the terms of it were finally agreed upon. These discussions and the fixing of the terms of the compromise were carried on and done by W. R. Gunn counsel for Mrs. Hill and by Menager, the trustee counsel, for Lewis; and when completed it was by them reduced to writing and consisted first of an agreement to be submitted to and signed by the parties to the suit, whereby this injunction was to be dismissed agreed by an order to be made at the next May term of the circuit court of Mason county, and secondly of a certain agreement to be signed by these parties after these two tracts of land containing 463 acres had been sold by the trustee, James B. Menager, and purchased by Peter S. Lewis, whereby Jane E. Hill was to have an option till January 1, 1887, to re-purchase this land on certain terms and conditions. This paper was then at the time of the agreement between the counsel in April, 1885, drawn up, but the date was left blank, as it was to be dated and signed the day of the sale.    It was as follows:

" This agreement made June 6, 1885, between Jane E. Burns, late of the county of Mason, and State of West Virginia of the first part and Peter S. Lewis of the said county of the second part, witnesseth : That whereas the said Peter S. Lewis has become the purchaser and owner of the tracts of land formerly owned by Henry P. Elias, situate in the county aforesaid, and which the said Peter S. Lewis purchased at a sale thereof made by James B. Menager, trustee, on June 6, 1885, in pursuance of the terms of a certain deed of trust executed by said Henry P. Elias, dated March 17, 1881, to secure certain notes therein described to Mary E. and Maria S. McCulloch, and which tracts of land are fully described in said trust deed, the said Peter S. Lewis hereby agrees that the said Jane E. Burns may become the owner of said tracts of land at any time on or before January 1, 1887, by paying

to the said Peter S. Lewis, his personal representatives or assigns, the sum of $19,400.00 with legal interest thereon from the date of said sale under said trust deed, and in addition thereto paying to the said Peter S. Lewis, his personal representatives or assigns the sum not exceeding $300.00 per year for sowing grass seed and repairing the fences upon said tracts of land and refunding the taxes upon said land paid by Peter S. Lewis, his personal representatives or assigns. In the event the said Jane E. Hill purchases the said tracts of land within the period of time aforesaid she is to take the same, subject to the rights of any and all tenants of the said Peter S. Lewis, his personal representatives or assigns, who may be occupying said tracts of land at the time she so purchases the same or any part thereof, but said Lewis is not to rent or lease said tracts of land or any part thereof for a longer time than one year after the said Jane E. Burns may become the purchaser of said lands as aforesaid, and the said Jane E. Burns is to have all net profits that may arise from the operation of said tracts of land between the day of sale of said tracts of land by said trustee and the purchase of the same by Jane E. Burns, after paying the taxes accruing, or paid by said Lewis, his personal representatives or assigns on said land uring said period and after paying the interest on $19,400.00, the amount agreed to be paid by her as purchase-money for the same during the same period, and after paying the amount so allowed for fencing and grassing as aforesaid; but in ascertaining the net profits aforesaid, the present wheat crop growing upon said tracts of land is not to be estimated. It is further agreed that said Jane E. Burns may occupy that portion of said lands as is reserved by her in a certain agreement made by her with E. L. Neal as trustee for William R. Gunn and others on January 17, 1885, and of record in the clerk's office of the county court of Mason county, West Virginia, until January 1, 1886, when she is to surrender peaceable possession thereof to the said Peter S. Lewis, the personal representatives or assigns of said Peter S. Lewis. It is further agreed that in the event the said Jane E. Burns shall become the purchaser of said tracts of land from said Peter S. Lewis by complying with the terms of this agreement in paying for the same, that he will make or cause to be made to her a

good and sufficient deed for said tracts of land. It is further agreed that this option to purchase shall not be construed to be a mortgage."

It will be seen, that in this written compromise afterwards signed by the parties nothing is said about the wheat growing on said land except that "In ascertaining the net profits of the land, the present wheat-crop growing upon said tracts of land was not to be estimated." From this it might be inferred perhaps, either that, if Peter S. Lewis became the purchaser of the land, he was not thereby to acquire any title to the wheat-crop, any interest in it having been relinquished and surrendered, when this compromise was made in April, 1885, as is contended by Jane E. Hill to have been her understanding of the arrangement; this arrangement to be carried out simply by a verbal understanding between the trustee, James B. Menager and Peter S. Lewis, who, it was known, would be the purchaser, that when he purchased, he was to be regarded as purchasing the land and not the wheat, just as he would, if the sale had been made after the wheat was cut. On the other hand the defendants, Hanley, Gunn & Gibbons and Van Matre insist, that by the terms of this arrangement they were to have this wheat to pay the debts secured them in the deed of trust of February 17, 1885. While this would not be inconsistent with the terms of this written compromise, it certainly would be impossible to infer from the written compromise, that they were to acquire any sort of interest in the wheat. But they insist, that there was a verbal understanding to this effect, when this compromise was made.

When the terms of this compromise were agreed upon, and these writings were drawn by the counsel of the parties in this suit, Lewis was in New Orleans. On his return he agreed to the compromise, and he and Jane E. Hill signed the agreement to dismiss the injunction suit at the May term of the circuit court of Mason, which was accordingly done early in May. Lewis also agreed, that after he had purchased the land, he would sign the agreement above stated in full, which though dated June 6, 1885, was drawn when the compromise was made, whereby Jane E. Hill, *alias* Jane E. Burns might re-purchase this tract of land. He also, as

is claimed by Mrs. Hill, then agreed to relinquish all his right in the crop of wheat growing on the land, which should not be regarded as sold, if he should purchase the land. But the defendants, Hanly, Gunn & Gibbons and Van Matre claimed that this was not so, but that Jane E. Hill and Peter S. Lewis agreed, that this wheat-crop should be sold with the land, and that when Lewis purchased, he would let them have it to pay their debts secured in the deed of trust ot February 17, 1885, on this wheat-crop. Shortly after this A. W. Kernes, trustee in the deed of January 23, 1885, conveying this wheat crop for the benefit of J. M. Kerr removed to Colorado to live.

This being the state of the case the trustee, James B. Menager, advertised the land at public sale on June 6, 1885, and as had been understood, Peter S. Lewis became the purchaser bidding therefor $16,500.00. On the day of sale Jane E. Hill under the name, by which she was generally known, Jane E. Burns, and Peter S. Lewis signed the agreement giving to her the privilege of purchasing this land of Peter S. Lewis in accordance with the agreement of compromise made in April previous. Ten days afterwards James B. Menager executed as trustee a deed for this land to Peter S. Lewis, the purchaser. In accordance with the claim set up by Hanly and Gunn they informed E. L. Neal the trustee in the deed of trust on the wheat-crop growing on this land, that his duties as trustee under that deed had ceased, and that they wished him to take care of and harvest and thresh and sell the same and deduct expenses thereof and what was right for his services, and to pay the residue of the proceeds on the debts, which were named in the trust-deed to him and in the order of priority therein stated. Under this authority Neale commenced having this wheat-crop cut about June 28, and having cut all that was then ripe, suspended for a few days.

On June 30, 1885, J. M. Kerr presented his bill in this cause to the judge of the circuit court of Mason county in vacation claiming said wheat-crop under the deed of trust of January 30, 1885, for his benefit, asking the appointment of a receiver to take charge of, harvest, thresh and market said wheat and bring the proceeds thereof into court to be dis-

posed of, as to the court might seem proper, and that defendants Jane E. Hill, A. W. Kernes, trustee, E. L. Neal, trustee, A. A. Hanly, W. R. Gunn and John A. Gibbons, partners under the firm name of Gunn & Gibbons, D. S. Van Matre, Ella B. Jenkins, W. R. Gunn and Josiah Arrington and each of them their agents and attorneys might be restrained, enjoined and inhibited from cutting, threshing or in any-wise interfering with or disposing of said wheat, and for general relief. This bill states, that Jane E. Hill executed on January 23, 1885, the deed of trust to A. W. Kernes, trustee, on this crop of wheat for the benefit of complainant and for his security, which deed of trust has been hereinbefore fully described. This deed of trust was duly recorded January 31, 1885, and a certified copy thereof filed with the bill.   It also states the giving by Jane E. Hill subsequently the deed of trust of February 17, 1885, to E. L. Neal, trustee, on the same crop of wheat for the benefit of sundry of the defendants above named.   The contents of which deed of trust have been fully stated above; and that this deed of trust was duly recorded February 18, 1885, and a certified copy of it is filed with the bill.   The bill further alleges that the quantity of ground, on which this wheat is growing is, as stated in these deeds of trust, 170 acres.   The bill then proceeds as follows:

"The plaintiff further says that he is informed and believes and so charges the fact to be, that the defendant, E. L. Neal, at the instigation and under the direction of the said A. A. Hanly and W. R. Gunn, has entered the field where said crop of wheat is growing and has taken possession and control thereof as such trustee, and has commenced cutting the same, and threatens to have the same threshed as soon as cut, and sell the same and turn over the proceeds of sale therefrom, after paying the expenses of cutting, threshing, &c., to the said Hanly, Gunn and others, mentioned in said second deed of trust marked 'B,' thereby depriving this plaintiff entirely of his security for his debt, and those he is liable for as such surety of Jane E. Hill, whom he charges is totally insolvent and has no other property whereby this plaintiff could make his debt and those he is liable for as her said surety.

"The plaintiff further says that the defendant, A. W,

Kernes, the trustee in the first mentioned deed of trust marked 'A,' is a resident of the State of Colorado at the present time, and can not be gotten here in time to enter upon and take possession of said growing wheat before the same is cut, threshed and sold, neither can a notice be given and a new trustee appointed in said deed of trust before next September, · the time of the holding of the Mason county circuit court."

This bill concludes with the prayer for the appointment of a receiver and for an injunction as above stated and for general relief. It was sworn to by the plaintiff. The injunction asked for was at once granted by the judge on a bond with good security and a proper condition specified being given, and at the same time Gideon Brown was appointed by the judge in vacation a special receiver to take charge of, cut, thresh and sell said crop of wheat upon his giving bond in the penalty of $1,000.00 with good security, to be approved by the clerk of said court, for the faithful performance of his trust and paying over and the accounting for according to law of all such moneys, as may come into his hands by virtue of his appointment as such special receiver. By the direction of the judge this order granting an injunction and appointing a receiver was on July 30, 1885, entered as an order of the court made in vacation. A joint answer to the bill was filed by A. A. Hanly, Gunn & Gibbons, W. S. Van Matre and W. R. Gunn. In their answer they allege the making by H. P. Elias on March 17, 1881, of the deed of trust on said two tracts of land to secure debts due Peter S. Lewis and allege, that a crop of wheat was growing on 170 acres of the land. They allege also that the deed of trust was duly recorded ; that this land with this wheat-crop was sold under this deed of trust by the trustee on June 6, 1885, and purchased by Peter S. Lewis and was conveyed to him by the trustee, James B. Menager, on June 16, 1885, by a deed duly recorded, a certified copy of which is filed with the answers. Their answer then alleges:

" Immediately after the sale of said lands to said Lewis, these respondents became the owner of said wheat-crop ; that these respondents acquired the title thereto from the said Lewis on the day he became the owner of the premises as aforesaid, and that they claim title thereto solely by,

through and under him and no other person. Respondents further say that all right or title the plaintiff may have acquired by virtue of the deed of trust to said Kernes was extinguished by the sale of the same land and premises to the said Lewis as aforesaid and these respondents aver that said plaintiff, was at the time he presented said bill for an injunction and at the time the injunction was awarded him fully advised and knew that the land and premises including the growing wheat as aforesaid had been sold and conveyed to the said Lewis as aforesaid, and that all the plaintiff's right and title under the trust deed to Kernes was extinguished."

This answer concludes as follows :

"Respondents deny that the said E. L. Neal has wrongfully taken possession of said growing wheat, and denies that, unless your Honor's Court interferes and restrains the sale of said wheat that it will work *irrepairable* injury to plaintiff, and a complete loss of his security for said before mentioned debts.

"Respondents say that they are justly and fairly entitled to the possession and control of said wheat crop by reason of their purchase thereof from said P. S. Lewis as aforesaid.

"They further say that said plaintiff is not entitled to have said wheat or any part thereof appropriated to the payment of any of the debts or claims described and set out in the trust deed to the said Kernes, and the respondents ask that that the injunction awarded the plaintiff be dissolved and the bill dismissed."

This answer was sworn to in the usual form by W. R. Gunn.

The deposition, of Jane E. Hill, Peter S. Lewis and J. M. Kerr, the plaintiff, were taken on behalf of the plaintiff. And on behalf of the defendants were taken the depositions of three of the defendants W. R. Gunn, J. A. Gibbons and A. A. Hanly and also the deposition of J. B. Menager, one of the counsel of these defendants in this cause. These depositions for the plaintiff and for the defendants prove the facts hereinbefore stated but with reference to what disposition was to be made of this crop of wheat under the compromise, whereby the injunction suit to prevent the sale of said land

was dismissed, the witnesses in their depositions gave evidence quite conflicting; and as it was one of the main questions in controversy in this cause, I will give briefly a statement of the evidence on this point.

Jane E. Hill testified as follows:

"Question.—Was the growing wheat-crop on said land excepted from said sale under the deed of trust to Peter S. Lewis or in other words, were you or Peter S. Lewis to have the benefit of said wheat crop?

"Answer.—I was to have the benefit of the wheat-crop this year."

"Question.—What was said at the time in regard to the deed of trust on said wheat-crop given the plaintiff on this cause?"

"Answer.—Well I mentioned that I had given a mortgage on it to Mr. Kerr to secure him for things he had paid and that I would not sign any papers whatever, that would interfere with it; I might not have used these words, but this is the substance of it."

She filed with her deposition the written agreement of compromise hereinbefore set out at length dated June 6, 1885, which was signed by her and Peter S. Lewis. It was marked Exhibit No. 1.

The following are the portions of the depositions of Peter S. Lewis, which bear on this subject particularly.

"Question.—What became of said chancery suit in which you were enjoined?

"Answer.—It was dismissed by agreement.

"Question.—What was the agreement; was it reduced to writing afterwards, and if so, examine Exhibit No. 1 filed with Mrs. Hill's deposition, and state if it contains the agreement between you and her?

"Answer.—It is the agreement.

"Question.—At the time of your entering into said agreement, did you know that the plaintiff in this cause had a deed of trust to secure him upon the then growing wheat crop upon said premises?

"Answer.—At the time of entering into this agreement nothing was said to me about Mr. Kerr having a deed of trust upon it, but I am satisfied that I had heard of it previous to that time.

Question.—Who was to have the benefit of the growing wheat-crop, yourself or Mrs. Burns?

"Answer.—I was not to have the benefit of it. My understanding was that the wheat-crop or the proceeds of the wheat-crop were to go to Messrs. Gunn and Hanly with Mrs. Burn's consent.

"Question.—Did you ever in any way sell or dispose of said wheat-crop to Gunn & Gibbons and Van Matre, or was it your understanding that Mrs. Burns was to have said crop free from your control?

"Answer.—I never sold the crop to any of these gentlemen, and I don't see how I can answer this question in any better manner than I have done in the preceding question.

"Question.—Did you attempt in any way to control Mrs. Burns in what disposition she should make of said wheat-crop?

"Answer.—No. I did not.

"Question.—Is it not a fact, that Mrs. Burns refused to enter into any compromise with you without you would give her, or exempt from the operations of the sale under the deed of trust afterwards made, the then growing wheat-crop on said lands, and did she not state as a reason that Kerr had went her security to Moore for the seed wheat, and that she owed other indebtedness which she wished to pay out of said wheat-crop?

"Answer.—I had no conversation with Mrs. Burns in regard to this written agreement; it was prepared during my absence from home by my attorney and hers; I suppose on its submission to me I approved of it, and Mrs. Burns did not refuse to me to enter in a compromise. She did not tell me anything about the Moore debt.

"Question.—Did you not know that under the sale it carried with it, the then growing wheat-crop and if so at what instance did you release your right to 150 acres of wheat?

"Answer.—I understood that it did carry it with it, and that that growing wheat-crop and the option of redemption to Mrs. Burns was the consideration, on account of which she consented to the sale.

"Question.—Do you remember of having any conversation at your house last Monday a week ago with the plaintiff in

relation to the ownership of this wheat-crop, and if so what did you say to him?

"Answer.—I do remember of Mr. Kerr coming to my house about the time mentioned, and had a conversation of considerable length with him. I can't remember the whole of it. I will say this that the most important, in my opinion, point in our conversation was a question from Mr. Kerr to me as to what was my understanding of the disposal of that wheat-crop and in reply I told him that I understood it was to go to to Messrs. Gunn and Hanly.

"Question.—From whom did you get your information that the wheat-crop was to go to Gunn and others?

"Answer.—I got that information from my attorney, and, I think from the other attorneys.

"Question.—Did you not tell Mr. Kerr on the occasion referred to that you knew 'but little about the matter, and what you did know you had got from your attorney or attorneys, and that they had informed you that Mrs. Burns had agreed for it—the wheat-crop—to go to Gunn and others. I do not intend that my question shall embrace the exact words spoken by you, but does not my question embrace the substance of the conversation, and if not, wherein did the conversation differ from the question asked?

"Answer.—I think this would come nearer being the substance on that point. I told Mr. Kerr that I had not bothered myself very much about the disposal of that wheat-crop; that I knew it was lost to me; that my information as to the disposal of it came from the attorneys principally."

"CROSS-EXAMINED.

"Question.—Was it not understood in your compromise that if you became the purchaser of the land referred to under the trust sale mentioned, that Gunn and Hanly were to have the wheat-crop, and that if you did not become the purchaser, then you had no control over said wheat-crop and Gunn and Hanly could expect no part of the crop through you?

"Answer.—Yes, that is my understanding.

"Question.—Was not this understanding consummated as as far as you had any power in the matter?

"Answer.—The sale was made; I purchased the property and signed the agreement, and agreed to that disposal of the wheat-crop."

"Question.—What control did you have over the wheat-crop before Mrs. Burns consented to let you make the sale under the trust?

"Answer.—I don't know that I had any.

"Question.—What steps did you take to persuade Mrs. Burns to give a deed of trust on said wheat-crop to Gunn, Hanly and others?

"Answer.—I did not take any.

"Question.—Then so far as you were concerned when the compromise was made giving her the growing wheat-crop you had no interest as to what she done with the same?

"Answer.—By the compromise I relinquished my interest in the wheat-crop, and it was a matter of no importance to me what became of it."

Kerr in his deposition states nothing on this subject except what Peter S. Lewis told him, which I regard as but hearsay and we have given Lewis' own statements on oath in relation to this matter. The defendants' witnesses in their depositions conflict more or less with this testimony of the plaintiff's witnesses on this question.

J. A. Gibbons one of the defendants testifies as follows on this question:

" Question.—Please state, if you know whether Mrs. Burns was aware of the fact that the ownership of the wheat-crop in controversy would pass to Gunn & Gibbons, A. A. Hanly, W. R. Gunn and D. S. Van Matre, and whether she consented thereto?

" Answer.—Some days after the proposition made by Captain Gunn to Mr. Lewis had been accepted, Mrs. Burns came to our office with a copy of the agreement that was to be entered into between the parties, and said she had consulted Judge Knowles and Judge Brown and that they had both told her that they could not raise the money for her to discharge the Lewis debt, and that it would be a good thing for her to do. We at that time had a very full talk with her as to the scope and effect of the agreement, and during the conversation Mr. Hanly and Mr. Menager were both in our office, not all the time but portions thereof, and Captain Gunn told her that he had made the proposition to Mr. Lewis, thinking

that it would be a good thing for her and the best she could do. He told her, as did Mr. Hanly and myself, that if she entered into the agreement the sale of the farm would take place, and that it would be absolute and would wipe out all deeds of trust and liens on the wheat, or any thing else belonging to the real estate; that the sale would carry with it all crops growing on the farm except what might belong to tenants; but if Mr. Lewis became the purchaser at the sale he would sign the written agreement giving her the right to repurchase the farm as provided therein, and that the wheat crop then growing on the farm would go to us (meaning Gunn & Gibbons, A. A. Hanly, W. R. Gunn and D. S. Van Matre.) After these explanations she consented to the proposition and signed the written agreement."

W. R. Gunn, another of the defendants testifies in speaking of this compromise, whereby this injunction suit was agreed to be dismissed:

" It was at the same time further agreed by the said Lewis, that in the event he became the purchaser of the land under the trust sale that the then growing wheat-crop upon the land should become the property of this deponent and A. A. Hanly, to be applied by them after paying expenses of harvesting the same and other expenses incident thereto, to the payment of certain debts and claims due them and certain other creditors mentioned in the trust deed 'B.' filed with the plaintiff's bill according to the amounts and in the manner, and according to the priorities mentioned in said trust deed to Neal; that it was at the same time agreed and understood between said Hanly, Gunn & Gibbons, and D. S. Van Matre and Lewis, that if some other person became the purchaser of said land, that said Gunn and Hanly of course acquired no title to said wheat by virtue of the arrangement; as to the disposition of the wheat as aforesaid, the said Lewis, John McCulloch and the defendant, Jane E. Burns, affiant, the defendants Gibbons, Hanly and Van Matre were parties, and the said Jane E. Burns expressly agreed to such disposition of the wheat-crop in the event said Lewis purchased the land under the trust sale. * * * * I then made a proposition to Mr. Lewis, through his attorney, suggesting that Mrs. Burns might entertain a proposition such as I have

already stated, and was informed by Mr. Lewis, or his attorneys, that he would entertain the same. Mrs. Burns then said to me, that she still thought she could borrow the money, and desired further time to see Judge Knowles, who she said was endeavoring to negotiate the loan for her. She, however, came to us afterwards in our office, and said she was advised by Judge Knowles to accept the terms and desired to do so. I then again saw Mr. Lewis and his attorneys, who agreed that Mrs. Burns should have the option to purchase and stated that Hanly and myself were to have the wheat-crop in the event he purchased the land. The consideration for the wheat passing into the ownership of Gunn & Gibbons, was for their legal services rendered to her by them as her attorneys, in prosecuting the chancery cause aforesaid and for effecting said compromise."

J. B. Menager, one of the counsel of the defendants in this cause, says:

"During the talk about the compromise Mrs. Burns was told by Gunn & Gibbons, her attorneys, that the sale of said property was inevitable; that they had done all they could for her, and that a sale of said property would put the title to said land in Mr. Peter S. Lewis and all crops thereon growing on said land. She made no objection to that. The distinct understanding with Mrs. Burns, Gibbons & Gunn, Van Matre and Hanly was, that if Mr. Lewis should become the purchaser of said land when sold, that he, Lewis, was to let Gibbons & Gunn, Van Matre and Hanly have the wheat then growing on that land. Nothing was said about the Kerr debt. I was present in Gunn & Gibbons' office when the matter was fully explained to Mrs. Burns; she afterwards signed the agreement with Mr. Lewis."

He states afterwards, that he did not show the memorandum of the terms of the proposed compromise to his client, Lewis, and that he was not certain that he was not then in New Orleans, and that when he returned, the contract had been drawn up by the attorneys. He states that English and Polsley were attorneys with him for Lewis and were consulted as to the shape in which the contract was to be put, and that when Mr. Lewis returned from New Orleans the contracts were shown to him. He read and approved

them, signed the one for the dismissal of the suit, and signed the other after the sale. A. A. Hanly, the only other witness, says nothing about the compromise, but says Lewis after his purchase of the land turned the wheat-crop over to Gunn and himself by saying we could have it and had his permission to cut and move it from the ground. When asked if he expected to pay anything to Lewis for this wheat he said : "If he demands anything from us we expect to pay him." The evidence shows, that the usual crop of wheat on these 170 acres of land was not less than 1,700 bushels, but that in the year 1885 the crop was very short, and the land in question produced probably not more than 700 bushels. It is also shown that Mrs. Hill owned a small house in Ohio worth some $1,200.00, which had been attached by the Ohio Valley Bank at Gallipolis, Ohio, to pay the $500.00 negotiable note, on which A. A. Hanly was endorser, and which was named in the deed of trust on this wheat-crop of February 17, 1885.

On September 26, 1885, the circuit court of Mason rendered the following final decree in this cause.

"This cause came on this day to be finally heard upon the bill and exhibits filed, the process duly served upon each of the defendants and upon the proceedings had at rules and upon the joint and several answers of A. A. Hanly, Gunn & Gibbons, D. S. Van Matre and W. R. Gunn, and the exhibits therewith filed and general replication thereto, and upon the bill taken for confessed as to all the other defendants and regularly set for hearing as to them, and upon the proofs and depositions taken and read, and was argued by counsel for both plaintiff and defendants ; and the court after mature deliberation is of the opinion that the plaintiff is not entitled to the relief prayed for ; and doth adjudge, order and decree that the injunction heretofore awarded in this suit be dissolved and the bill be dissmissed, and that the defendants recover of the plaintiff their costs about their defence in this behalf expended, including a statute fee of $20.00, and it is further adjudged, ordered and decreed that Gideon Brown, the receiver heretofore appointed in this suit be discharged, and that he turn over to the defendant, E. L. Neal, any property or money that may be in his hands by reason of

said receivership. The plaintiff desiring to appeal from this decree, the operation thereof is hereby suspended for thirty days, when the plaintiff or some one for him shall have given bond before the clerk of this court with good security in the penalty of $100.00 conditioned to pay all costs and damages which may be sustained or incurred by the defendants or any of them by reason of said suspension in case no appeal shall be awarded in this case."

From this decree J. M. Kerr·has obtained an appeal and *supersedeas.*

Opinion by GREEN, JUDGE :

The first question, which presents itself in this case is : Had a court of chancery any jurisdiction? The appellee's counsel insists, that it had not, because the appellant had a complete and adequate remedy at law ; and to support his position he refers to the causes of *Baker et al.* v. *Rinehard Mayer & Co.*, 11 W. Va. 238, and *White* v. *Stender*, 24 W. Va. 615. In these two cases it was held, that a court of equity ought not to take jurisdiction and award an injunction to stay sale of personal property levied on by a sheriff either on an execution or for unpaid taxes, when the property is from its nature of no peculiar value to the owner, or when its sale would not obviously injure the owner greatly by consequential damages which could not be recovered in a common law suit, because except in such cases the owner would obviously have a complete and adequate remedy at law. But these causes differ essentially from the cause before us. The appellant here having but an equitable claim could have instituted no suit at law, and his trustee A. W. Kernes, had he not been a resident of the distant State of Colorado and therefore unable to perform his duty as trustee in taking possession of the growing wheat-crop in controversy, could, if here, have had no adequate remedy at law for the wrong complained of. He could, it is true, have brought against E. L. Neal, the trustee in this second deed of trust, a personal action at law for the very small amount of wheat, which he had cut and taken. But of· course this would not redress the wrong complained of by the appellant. An action of ejectment or of unlawful entry and detainer for the wheat

uncut but just about to be cut by Neal, the trustee of others, if such action could lie, would have been unavailing, and judgments if recovered could not be enforced, as before they could have been obtained, the wheat would have been converted into personalty, and the plaintiff could not under execution on judgment in such real action have been put in possession of such personalty. This contract would have been between two trustees, neither of whom claimed any personal interest in the wheat. And it seems to me clear, that as a common law suit brought, when this suit was instituted, could have furnished no adequate remedy for the wrong complained of by the appellant, the plaintiff below, a chancery court clearly had jurisdiction of the case.

The next enquiry is, whether the transactions between Peter S. Lewis and Jane E. Hill constituted a mortgage by her to him to secure his debt of $19,400.00 with interest, if not paid before January 1, 1887, or whether he became the owner of the farm of 463 acres by his purchase on June 6, 1885, and by the deed executed to him by the trustee on June 6, 1885. For if these transactions amounted to a mortgage only of this farm to Lewis by Jane E. Hill, then of course she remained the owner of the land and of course of the wheat growing on it; and this wheat-crop by virtue of the two deeds of trust, which she had executed, would be liable to the payment of the debts secured thereby, first to the payment of the debts secured in the first deed of trust, and, if after their payment in full anything remained, it would be applicable to the payment of the defendant's debt secured in the subsequent deed of trust, which is the position taken by the counsel for the appellant.

There can, I think, be no reasonable doubt, that Lewis by his purchase of this farm at the public sale on June 6, 1885, and the subsequent deed to him by the trustee became the absolute owner of the farm; and that the agreement entered into by him and Jane E. Hill on June 6, 1885, gave her only an option up to January 1, 1887, to purchase this land of Lewis for $19,400.00 and the interest thereon. The fact that the amount, which was charged her for this land, was just the amount of the debt, to secure which Lewis had a lien upon the land prior to the purchase, will not, when

considered with all the other circumstances in the case, convert into mortgage what was on its face an absolute deed with an option to J. E. Hill to purchase the land within a given time.

The circumstances bearing on this question are these: Peter S. Lewis had a deed of trust on this farm to secure a debt of $19,400.00, which had been due for a number of years; and by the terms of the deed of trust Peter S. Lewis could at any time require the trustee to sell the farm to pay his debt. In January, 1885, Lewis required the trustee to advertise the farm for sale. Thereupon Jane E. Hill the owner requested him to extend the time of the payment of the debt for twelve months or for even six months, which he refused to do. On the day the sale was advertised to be made, February 16, 1885, Jane E. Hill obtained an injunction forbidding the sale till the further order of the court. The bill, on which this injunction was awarded, asked it principally for the reason that the debt, for which this land was about to be sold, contained in it a large amount of usury. Thereupon a compromise was made, which leaving out for the present any consideration as to what was then to be done with the wheat growing on the land amounted to this, that the chancery cause, wherein this injunction was awarded, should be dismissed, and the sale be made by the trustee, Menager, and the farm purchased by the creditor, Lewis, who was to give Jane E. Hill the option up to January 1, 1887, of purchasing the farm of him for a price equal to his debt of $19,400.00 with interest, and she was to have possession of a portion of this farm for a time after Lewis had purchased it. There were certain other circumstances and conditions in reference to this option of purchase to be given Jane E. Hill, which are set out in detail in the written agreement between Lewis and her dated June 6, 1885, and hereinbefore given at length, which I deem unnecessary to here repeat, as an examination of them will show, that they throw no light on the question, whether this transaction constituted a mortgage, or whether it will be regarded by the Court as really what on its face it purported to be.

There have been a number of cases decided by this Court, in which the principles, which should govern courts in determining, whether a transaction is to be regarded as a mort-

gage or an absolute sale or a conditional sale or sale with an option to re-purchase, have been laid down. Without reference to authorities elsewhere I think the application of the principles as laid down by this Court will readily settle the question, whether in this case these transactions amounted to a mortgage or not.    These West Virginia cases are: *Klinck v. Price,* 4 W. Va. 4; *Lawrence et al.* v. *Dubois et al.,* 16 W. Va. 443; *Davis, Committee* v. *Deming,* 12 W. Va. 281; *Vangilder* v. *Hoffman,* 22 W. Va. 1, and *Matheney* v. *Sandford,* 26 W. Va. 386. I do not deem it necessary to consider particularly any of these except the two last, in which may be found the principles governing this Court in determining such a question, as I am now considering, summed up.

In *Vangilder* v. *Hoffman,* 22 W. Va. p. 2, point 7, of syl. it was decided:

"If the proof offered to established, that a deed absolute on its face was intended to secure a loan of money and was therefore a mortgage consist, only of the parol declarations of the parties, such proofs, in order to prevail, must be clear and strong, if it be unaided by proof of the situation and circumstances of the parties and their conduct prior to, at the time of, or after the execution of the deed.    The following circumstances and facts have great weight in leading a court to the conclusion, that a deed absolute on its face is merely a mortgage:    First that the grantor was hard pressed for money, and the grantee was a known money lender:    Second, that the actual execution of the deed was preceded by a negotiation for a loan of money by the grantor to the grantee:    Third, that the parties did not apparently consider or contemplate the quantity or value of the land, when the deed was made.    Fourth, that the price professedly given for the land was grossly inadequate.    Fifth, that the possession of the land has remained with the grantor whether rent be nominally reserved or not and if no rent is ever professedly reserved this last circumstance is entitled to very great weight, if unexplained."

In *Matheney* v. *Sandford,* 26 W. Va. 386, point 1 of syl., it was decided by this Court:

" It it is claimed, that a deed conveying a tract of land in consideration of a debt due from the grantor to the grantee

was though absolute in its form a mortgage on this tract of land to secure this debt: the circumstance, that this debt was already secured by a deed of trust, executed by the grantor to the trustee conveying this identical tract of land to secure this debt and nothing else, is a circumstance so strongly indicating, that the transaction was what it purported to be, a sale of the land and an absolute conveyance and not a mortgage to secure this debt, that it would take very strong parol evidence and strong circumstances to justify a court in regarding it as a mortgage; and in such case as this the circumstance that the grantor was hard pressed for money, and the grantee was a known money lender, or that this debt (the price for the land) was considerably less than the value of the tract of land, and that the possession of the land remained with the grantor for several months afterwards without any rent paid therefor, or even professedly reserved, would be entitled to little weight to show that this deed absolute on its face was a mortgage, as against the circumstance, that the parties could not have thought of the transaction as the giving of a lien or mortgage on this tract of land for this debt, as a lien on this land to secure this debt already existed."

These principles, when applied to the case before us, would seem to clearly establish, that we can not construe the transactions between Jane E. Hill and Peter S. Lewis, when considered altogether, as they properly should be, as creating a mortgage to secure the debt due Lewis. It is true, that Jane E. Hill was hard pressed for money and in fact insolvent, that the actual execution of the deed to Peter S. Lewis conveying to him this farm had been preceded by a negotiation by Hill with Lewis to obtain for her an extension of six or twelve months for the payment of the debt to Lewis. But this negotiation had been closed apparently forever more than four months before, Lewis positively refusing to extend the time for the payment of the debt. The consideration paid by Lewis for the purchase of this land ($16,500.00) can not be regarded as grossly inadequate. It is true, that Jane E. Hill had frequently said it was worth from $25,000.00 to $35,000.00. On the other hand it is apparent, that Lewis paid about what he regarded the land was really worth; for

it is proven, that he had always thought, that whenever sold by the trustee it would not bring at public auction as much as his debt, and that he would have to buy it himself, though he did not want it. This is most clearly shown by the fact, that in April, 1885, when the compromise of the injunction suit was made, whereby it was agreed, that the injunction suit should be dismissed, and the public sale of the land should be made, the whole compromise was based on what was assumed would certainly be the case, that at the public sale the farm would not sell for the amount of Lewis's debt, and that he would buy it in for less than that amount, and he was then to give to Jane E. Hill some eighteen months, within which time she might purchase the farm of him for the amount of his debt ($19,400.00) and interest; and lastly the possession of said farm was not to remain with Jane E. Hill but was to go to the purchaser, Lewis, and remain with him and his tenants, except only a certain part, how much does not appear but probably a small part, which was to remain in the possession of Jane E. Hill for some seven months after this sale; and this, it seems, was to be allowed, because some six months before Lewis became the purchaser, an agreement therefor had been made with Neal, a trustee, to whom the farm had been conveyed till January 1, 1886, which agreement was simply confirmed.

According then to the principles laid down in *Vangilder* v. *Hoffman* there were some *indicia* which would tend to show, that there might have been a mortgage, had it been a private sale by Jane E. Hill to Lewis, and had he had, when said sale was made, no deed of trust on the farm to secure his debt. But even then the *indicia* were not very strong. But according to the rule laid down in *Mathency* v. *Sandford*, 26 W. Va., p. 386, these *indicia* of a mortgage, as they appear in this case, are entitled to but little weight to show that this sale to Lewis was a mortgage as against the circumstance, that Lewis had a deed of trust on this farm to secure his debt. The reason is obvious, why the circumstances, which I have referred to, are entitled to scarcely any consideration in determining, whether there was only a mortgage on this land for the benefit of Lewis and to prove his debts, and that he was not, what the papers showed him to be, a pur-

chaser of the land, when we consider, that Lewis already had a deed of trust on the farm to secure his debt. Under the circumstances disclosed by the record in this case it seems almost impossible to conceive, that there could have been an understanding, express or implied, that Lewis would postpone the enforcement of his debt, if Jane E. Hill would give him a mortgage on the farm. Of what possible use could such mortgage be to Lewis? Why should he desire to substitute a form of security on this farm, which he could only enforce by a suit in equity, for a form of security, which he already had, which he could enforce at any time at his pleasure? (*Matheney* v. *Sandford*, 26 W. Va., p. 402).

But it may be said, that, though he had the right to enforce his deed of trust at any time, he had been enjoined from so doing till the further order of the court, but that he would not be permitted to force this sale till his debt was purged of all usury, and that, when this should be done, it is probable from the evidence, this debt would be reduced by $1,400.00; and that the inducement, which might have operated on Lewis to abandon his deed of trust for a mortgage on the same land, was the abandonment by Jane E. Hill of her claim to have this usurious interest struck from the debt, and that this was rendered more probable, as Lewis had already lost by the granting of the injunction the right, which he had had to have this farm sold at his pleasure.

There is nothing in this; for, if this be regarded as a mortgage, Jane E. Hill has not abandoned her claim to have the debt purged of the usurious interest; and after January 1, 1877, when Lewis might apply to a court of equity to foreclose this supposed mortgage, Jane E. Hill could then as well as now insist, that before the mortgage was foreclosed and the farm sold, this debt should be purged of its usurious interest, in other words she could then set up precisely the same grounds, why the farm should not be sold under the mortgage, as she did set up in the injunction-cause, why it should not be sold under the deed of trust. So that, if this transaction creates only a mortgage on the farm in lieu of the deed of trust upon it, the effect would be, that on January 1, 1887, so far as the enforcement of this debt was concerned, Lewis would be in precisely the same condition

he was in on January 1, 1885. And though he had refused to grant an extension of six or twelve months for the payment of this debt, he would then under the advice of learned counsel have gone into an arrangement, which would have extended credit on this debt for two years, and that too without the waiving by Jane E. Hill of any controversy about the validity of the debt or its true amount because of usury or for any other reason. It seems to me, the evidence plainly shows, that neither had she understood, that by this compromise any such extension of time was given to her, but all that was given to her was the growing crop of wheat on the land and an option to purchase the land within eighteen months at a fixed price and the other advantages, which accrued to her under the written agreement of June 6, 1885, hereinbefore given at length in the statement of her case. The advantage, which Lewis in return gained by this compromise, was, that by having this farm sold and purchasing it himself and by giving to Jane E. Hill the option to purchase it of him within a given time for $19,-400.00 and interest from June 6, 1885, he forever closed any controversy, which she could ever have with him in reference to the amount of this debt. For she would have to pay $19,400.00 and interest for the farm, whether there was usury in the debt or not; and it is obvious, that, she being insolvent, this farm is all that Lewis will ever get for his debt, or that he ever expected to get. This compromise, as I understand it and it was shown by the written papers, was wisely entered into by both parties. But if it is interpreted as merely substituting a mortgage on the farm for the deed of trust already on it, there would be great difficulty by any amount of parol testimony to induce one to believe, that Lewis could have done an act so entirely senseless.

The Court therefore under the circumstances could not regard Jane E. Hill as the owner of the farm after June 6, 1885, when it was sold at public auction to Lewis, and that she had mortgaged it to pay the debt of $19,400.00 to Lewis, but must regard Lewis as the absolute owner of the farm and as having given to Jane E. Hill an option to purchase it of him at any time before January 1, 1887, at a fixed price. In reaching this conclusion it will be observed, that I have not even referred

to the clause at the conclusion of this agreement of June 6, 1885, which clause is: " It is further agreed, that this option to purchase shall not be construed to be a mortgage." For it is unquestionably true, that if the court could see from the circumstances surrounding the parties on June 6, 1885, that the real transaction was an agreement on the part of Lewis to postpone the enforcement of his debt, if it were secured by a mortgage on this farm, then despite this declaration that "it was agreed this option to purchase should not be construed to be a mortgage" signed by both the parties, it would be declared to be a mortgage.   For if the circumstances showed the transaction to be a mortgage, it would be so declared, as these circumstances then would establish an equity in Jane E. Hill superior not only to the terms of the deed executed by the trustee, Menager, to the purchaser, Lewis, but also superior to the distinct understanding of the parties expressed at the close of the agreement in the positive language above quoted. If the circumstances had shown that the transaction was really a mortgage, it would be against the policy of the law to allow such mortgage to be irredeemable, though it were ever so distinctly understood by the parties that it should be irredeemable, and though this distinct understanding was reduced to writing and signed by the parties.   It is against the policy of the law, that a mortgage shall ever be irredeemable, just as it is against the policy of the law to allow the creating of inalienable estates; such estates can not therefore be created by any language however clear contained in the deed or by any parol proof however strong showing that this was the express purpose of the parties.   These conclusions as well as the reasoning are found laid down by this Court in *Matheney* v. *Sandford*, 26 W. Va. 400.

But we have seen, the circumstances in this case show, that there never was a mortgage on this farm.   Had we supposed that any reasonable grounds appeared in this record for holding, that there was a mortgage on this farm to secure this debt to Lewis, and that Jane E. Hill was still the owner of this farm subject to this mortgage, we would have declined an examination of this question in the present state of the record; for this Court could not deprive Lewis of this farm by deciding that Jane E. Hill owned it, and that he had but a

mortgage on it to secure a debt, in a cause, in which Lewis was no party. Though if a proper bill had been filed, and the proper allegations had been made in it, and Lewis had been made a defendant, the court might have so decided, though in so doing it would have been rendering a decree settling a dispute between co-defendants, which it might do, if the bill had made allegations, which rendered such decree necessary to determine the plaintiff's right, though in so doing it settled a dispute between co-defendants. But if unnecessary to determine the plaintiff's rights as set up in his bill, no such decree could properly be rendered. But as we regard it, Jane E. Hill is not the owner of this farm subject to a mortgage in favor of Lewis; but Lewis is the owner subject to an option in Jane E. Hill to purchase it of him.

I have expressed these views, as they do not prejudice the rights of Lewis, who is not a party to this cause, and as they determine, that the plaintiff below, the appellant, can not maintain his cause, if it depends solely on his showing, that Jane E. Hill after the public sale of this farm on June 6, 1885, and its purchase by Lewis still continued to own it subject only to a mortgage on it to secure the debt of Lewis to $19,400.00.

But though Lewis purchased this farm on June 6, 1885, and is now the owner of it subject to this option in Jane E. Hill, it does not necessarily follow, that he thereby became the owner of the wheat-crop growing on it, as this wheat-crop by the prior understanding of the parties including Lewis may never have passed to him by this sale, or if it did it may have afterwards been by him transferred to others. In point of fact Lewis does not, as his deposition shows, claim that he has any interest in this wheat. It remains for us to inquire, to whom this wheat or the proceeds of it really does belong. The court below decided in directing it to be turned over to Neal, the trustee of certain of the defendants, that it belonged to them. I will first inquire into the right of Neal as trustee to the proceeds of this wheat.

In the answer of the defendants, A. A. Hanly, Gunn & Gibbons, W. S. Van Matre and W. R. Gunn, they claim to be the sole owners of the wheat, which, they say, was sold with the farm at the public sale by the trustee and passed with this farm to Lewis, and, they say, "immediately after the sale

of said farm to said Lewis these respondents became the owners of said wheat-crop ; that these respondents acquired the title thereto from the said Lewis on the day he became the owner of the premises as aforesaid, and they claim title thereto solely by, through and under him and no other person." This is all the statement in the answer of their claim to the wheat and of the manner, in which their title arose, except that they subsequently say : "that they are justly entitled to the possession and control of the said wheat-crop by reason of their purchase thereof from the said P. S. Lewis as aforesaid."

This joint answer of these defendants was replied to generally, which imposed on them the proof of the allegations contained in it, and though sworn to in the usual form by one of the respondents, W. R. Gunn, under our statute-laws this answer on the hearing the cause is regarded as mere pleading and has no weight as evidence and no more effect than an answer not sworn to. (Code, ch. 125, sec. 38, Warth's Code, p. 705.) These allegations of these respondents are wholly unsupported by any evidence, whether they are to be regarded as alleging, that the respondents purchased in the usual sense of this word this wheat immediately after Lewis acquired title to it, as the respondents allege, by the purchase of the farm at public sale, or whether by purchasing it of Lewis is meant, that they acquired title to it by a transfer of it to them by Lewis. This wheat having, as these respondents say, passed to Lewis, not because it was specially sold to him, but simply because it was realty and as a part of the land passed by the sale of the land, it would follow of course, that it could, while the crop was thus growing on the land, be sold or transferred by Lewis only by a written contract or assignment and not by parol. Such growing crop is real estate. See *Crews* v. *Pendleton*, 1 Leigh 305, where Judge Carr says : "There can be no doubt that if one sell his land without any reserve all crops, not severed, will pass to the purchaser. They are a part of the subject and enter into the price." And as a growing crop is real estate it comes directly within our statute of frauds. (Code of W. Va., ch. 98, Warth's Code, p. 624.) And by the seventh paragraph of sec. 1, it is provided that "no action shall be brought upon

any contract for the sale of real estate unless, the contract or agreement or some memorandum or note thereof be in writing and signed by the party to be charged thereby or his agent."

Now there is no pretence, that on or after June 6, 1885, when according to the statement in this answer Lewis became the owner of this wheat, it according to their claim not having been reserved in the sale of the farm on which it was growing, Lewis ever entered into any written contract, whereby he sold it to any one, nor did he ever sign any memorandum or note of any sort of such sale, unless the agreement made by him with Jane E. Hill and signed by both of them on the day of said sale can be regarded as a memorandum or note of such sale of the wheat. This agreement has been copied in full in the statement of the case. It provides for an option on the part of Jane E. Hill, therein called Jane E. Burns, to purchase said farm, just bought by Lewis, at any time before January 1, 1887, at a certain price; and it further provides, "that the said Jane E. Hill is to have all the net profits that may arise from the operation of said farm from that time to the purchase of the same by her after first deducting certain moneys which may be paid out by Lewis in improving said farm and paying taxes thereon," &c.; and then this contract proceeds: "But in ascertaining the net profits aforesaid the present wheat-crop growing upon said farm is not estimated." This is all that is said about this wheat.

The appellee's counsel insists, that, while the language of the memorandum is very ambiguous, it shows first, that the growing wheat was understood by the parties to belong to the purchaser, Lewis; and the provision, that it was not to be taken into account in ascertaining the profits of the farm from that time, indicated, that it had been disposed of by Lewis; and being thus ambiguous in its meaning this clause of the contract may be explained by parol testimony, and by such testimony it may be shown, to whom Lewis had disposed of this wheat, or to whom he had really agreed to dispose of the same. Now to me these appear to be very strange assumptions on the part of counsel. I can not see, that this clause in the agreement indicated, whether this

wheat belonged to Lewis or not.   If it had been reserved in making the sale of the farm, and thus never belonged to Peter S. Lewis, as the plaintiff below, the appellant, contends, of course it would be very proper that it should not be estimated in the profits, which from that time till her repurchase of the farm from Lewis were to go to Jane E. Hill; and it would be equally proper, if the wheat had been disposed of by Lewis to respondents or to anybody else; and it seems to me equally proper, if the wheat belonged to Lewis and had not been either disposed of or agreed to be disposed of by him.   In truth there is not the slightest ambiguity in this contract by reason of this clause.   It is totally immaterial why this wheat was by this contract not to be estimated in ascertaining the profits of the farm from that time forward. The wheat was not to be estimated, when in a certain contingency a settlement should be made between the parties to this contract.   This settlement could under this contract be just as readily made, as if the reason why this wheat-crop was not to be included in it had been assigned in the most formal manner.   Indeed the reason for this exclusion would have been entirely out of place in this contract.   It seems to me clear, that there is not the least ambiguity in this contract produced by this clause in it; and therefore no parol evidence of any sort could be admitted to explain the written contract.

Certainly there was nothing in the contract whereby this wheat was either sold or transferred by Lewis to the respondents.   Yet this contract is the only pretence of sale or transfer to these respondents and their statement in their answer that "immediately after the sale of this farm to Lewis these respondents became the owners of this wheat-crop; and that these respondents acquired title thereto from said Lewis the day he became owner of the premises," can refer to nothing but this agreement consummated by Lewis's signature on the day Lewis became the owner of the farm; and in it Lewis did not pretend to claim much less to transfer title to this wheat to any one, certainly not to the respondents in this cause, who were not only not parties to the agreement, but who were neither named nor referred to in it.   If it were possible to interpret this written agreeement as a disposing

of this wheat by Lewis, which it is not, of course the only person, to whom it could thereby have been disposed of, was Jane E. Hill, the only other party to this agreement.   But if this contract or agreement could be considered as ambiguous in reference to 'this wheat, which it is not, then the court could not for aid in interpreting it resort to such evidence as the appellees in this cause rely upon, that is, parol declarations of the parties or of third persons present, when the agreement was being made.   The law with reference to the character of evidence, which can be introduced in aid of the court in interpreting an agreement ambiguous on its face is well settled.   It is laid down in *Crislip, guardian, &c.* v. *Cain*, 19 W. Va. point 19 of syl., p. 442.:

"The court for aid in interpreting an agreement ambiguous on its face may consider parol evidence of the circumstances, which summonded the parties, and their situation, when the agreement was made, and also the conduct of the parties in carrying the agreement into execution; but the court can consider no other sort of parol evidence such as the declaration of the parties before at the time or after the execution of the agreement; nor can the court call in any kind of parol testimony to alter, explain or modify, the written agreement if it is ambiguous on its face."

This law, as thus laid down, has been frequently approved by this Court. (See *Depue* v. *Sergent*, 21 W. Va. 327, point 4 of syl.; *Hansford* v. *Coal Co.*, 22 W. Va. 71, point 5 of syl. *Transportation Co.* v. *Pipe Line Co.*, 22 W. Va. 614; *Findley* v. *Armstrong*, 23 W. Va. 126.)  Upon this question, whether the growing wheat on this farm would after the purchase of the farm under the compromise go to the respondents in this cause from Lewis, who would acquire it by his purchase of the farm at the public sale, it would seem to be entirely clear, that the evidence of all the witnesses of the defendants below, Gunn, Gibbons and Menager, must be rejected, as it could only be claimed as evidence to interpret the written contract between Lewis and Jane E. Hill.   They all testified on this subject simply to conversations had with Jane E. Hill or conversations had in her presence to the effect that Lewis was to purchase this farm including this growing wheat, and let the respondents or some of them have it, after he purchased it.

This he⁵could only do by writing; and if he ever did it he must have done it by this written agreement of June 6, 1885, the only written agreement relative to this farm he has ever made, since he purchased it; and this written agreement by the law as well established, even if it were ambiguous, could not be interpreted by evidence of this character. Such evidence is wholly inadmissible to aid in the interpretation of this written agreement.

If there could have been a parol contract for the disposition of a growing crop of wheat, it does seem to me, that there was an entire failure on the part of the defendants to prove any such contract. They assume that the purchase of the farm by Lewis carried with it this wheat; and they attempt to prove, that by a contract made by Lewis with Jane E. Hill he agreed to let the defendants or some of them have this wheat; and how do they attempt to prove this? By conversations had either with or in the presence of Jane E. Hill. When it is borne in mind, that at that time Lewis was in New Orleans and was neither himself present nor had any agent present, who was authorized to make any contract in his name in reference to the wheat, it would seem obvious, that these conversations with Jane E. Hill, whatever may have been their character, could never prove a parol agreement between her and Lewis, especially as she never saw him in relation to these matters, and the only communication between them was, that they each signed written contracts presented to them, which contracts, as we have seen, were entirely silent on the subject of the ownership or disposition of this wheat. I can not regard the testimony of the witnesses of the defendant below as proving any parol contract between Lewis and Jane E. Hill in reference to either the ownership or disposition of the wheat.

They were only conversations between Jane E. Hill and her several counsel and her security in the injunction-bond and perhaps others; but as Lewis was a thousand miles distant and had no agent authorized to do anything in the matter, they must have been regarded as mere conversations; and being so regarded, it is no wonder they made but little impression on the parties engaged in them or on those who heard them. That they made no impression on these parties

77

is shown by the fact, that no two of them agree upon the person to whom this wheat was ultimately to go. Thus Gunn in his deposition says: "As to the disposition of the wheat-crop Lewis, John McCulloch, Jane E. Hill, W. R. Gunn, Gibbons, Hanly and Van Matre were parties, and Jane E. Hill expressly agreed to such disposition of the wheat-crop, in the event Lewis purchased the farm at the trust-sale." No doubt all these parties except Lewis, who was in New Orleans and never saw Jane E. Hill at any time in reference either to the dismissal of the suit, the sale of the farm or in reference to this wheat, did have conversations in reference to the ultimate disposition of the growing wheat. But they were certainly parties to no agreement in reference thereto. These lawyers well knew that no agreement in reference to its disposition could be made except in writing; and the parties named never executed any such writing. But if it were otherwise, Lewis must be excluded from such agreement, as he was absent and had no agent there authorized to act for him in the matter, and that the other parties named had no power to make any agreement of any sort in reference to the disposition of the wheat.

On cross-examination Gunn says: "As to saying McCulloch agreed to the arrangement, I may have used the term improperly as to him, but he was present during several perhaps all the conversations referred to, and the arrangement made with Mr. Lewis seemed satisfactory to him." No doubt Gunn is right in saying, that McCulloch merely took part in these conversations about the disposition of the wheat-crop, from which conversations he inferred that an agreement could be deduced. But Lewis was not present at any of these conversations and had no agent authorized to act for him in the matter. He was then in New Orleans. He must be excluded from being a party to this supposed agreement as well as McCulloch, whose interest in the matter was perhaps that he was responsible to Lewis for the ultimate making of a portion of his debt of $19,400.00, which was a lien on the farm, on which this wheat was growing. But if these two be excluded from being parties to this supposed agreement, so must all the others. Indeed all, who took part in this matter, took part in it just as McCulloch

did. They talked over what disposition was to be made of this wheat-crop but never pretended to enter into any agreement of any sort in reference thereto. Indeed they never seemed in these conversations to agree as to what disposition should ultimately be made of the wheat; and it would seem as if there could have been no definite understanding in relation thereto, or if there was, it being understood that no agreement was being made, if all parties did concur in what ought to be the ultimate disposition of the wheat, as no agreement was ever made with Lewis or Jane E. Hill to carry out these views, the parties to these conversations have not unnaturally forgotten what was said.

W. R. Gunn is inconsistent in his statements. In his answer he, Gibbons, Hanly and Van Matre all say that these four parties and Gunn and Gibbons were to have this wheat; But in his deposition he says, that this wheat-crop was for the benefit of all persons secured by the deed of trust of February 17, 1885, in the order in which they were there secured, that is, for the benefit not only of the four persons named in his answer and Gunn & Gibbons but also Ella B. Jenkins and Josiah Arrington. But it may be said, that the two last, though to be included in the benefit of this wheat-crop, as they were to be paid last, had no substantial interest in it; but when this supposed agreement was made it must have been considered that they had a substantial interest; for not long before, on February 17, they had been included in a deed of trust, and of course it was then supposed the wheat-crop would produce enough to pay all others and them also; and then Kernes's deed of trust, which required some $800.00 to satisfy it, was expected to be satisfied first; but, in this supposed agreement it was to be excluded.

Gibbons is more consistent in his statement as to what was to be the ultimate disposition of the wheat. He says, it was to go just as had been stated in the answer to these four persons first named and Gunn & Gibbons as one, and we would infer from his answer and deposition equally, and not, as Gunn says, to the amount necessary to satisfy their several claims and according to the priorities fixed in the deed of trust of February 17, 1885. He says nothing whatever about this deed of trust,

Menager, in his deposition concurs in this respect with Gibbons but he excludes the firm of Gunn & Gibbons from any interest.

Hanly in his deposition, though he had made a different statement in his answer, appears to think that Gunn and Hanly were to have the wheat-crop; for he says Lewis turned it over to them. But strange to say he says, if Lewis should demand anything of them he and Gunn expected to pay him. Where he got this idea from does not appear; I should hardly suppose from the conversations, which took place, when the compromise was being talked about. No one else intimated, that there was any expectation on the part of any of these parties, who were to get the ultimate benefit of this wheat-crop, that they were to be called on to pay either Lewis or Jane E. Hill for it.

Jane E. Hill says she was to get the ultimate benefit of this wheat-crop.

Lewis, who was not present at any of these conversations and derived all the information he had with reference to the ultimate disposition of the wheat from his own attorney, Mr. Menager, and Mrs. Hill's attorneys, supposed that the proceeds of the wheat with the consent of Jane E. Hill was to go to Gunn & Hanly, and where he heard this nowhere appears.

On a review of all this evidence the fair inference seems to be, that there was some talk between the attorneys for the plaintiff in the injunction-suit, the attorneys for the defendant and Jane E. Hill as to what was to be the ultimate disposition of this wheat; that in these conversations no definite conclusion was reached except doubtless, as I will presently show, that Lewis was not to have it; that those attorneys well knew, that if the attorney for Jane E. Hill and Hanly, the security in the injunction, were to have any interest in it except what they would get under the deed of trust given by Jane E. Hill of date February 17, 1885, they could only acquire such interest by a written agreement. For these attorneys were good lawyers of considerable experience, whose services in this cause are estimated to be worth $500.00.

The reason, I presume, that no agreement was ever attempted

to be made, whereby these parties would be secured a just compensation for their services, when the compromise of the injunction-suit was made between Lewis and Jane E. Hill, was, that they regarded their fee as fully and amply secured and Hanly fully indemnified from possible loss as to the security of Jane E. Hill in the injunction-bond by the deed of trust on this wheat, though it was, they knew, subject first to a preceding deed of trust in favor of J. M. Kerr, which it would take about $800.00 to satisfy. The usual crop of wheat on the Ohio bottom land in Mason county is twenty bushels per acre; and if this usual crop was produced, the 170 acres would have produced 3,400 bushels, more than twice as much as was necessary to pay off both deeds of trust.

It is true that this 170 acres of land, although it ought, if it had been properly farmed theretofore, to have produced 3,400 bushels of wheat in an ordinary season, had been theretofore badly farmed, and the season had been bad, and it is possible that when this compromise was made, these lawyers knew that it would not produce 3,400 bushels; but it is most probable they had but little definite information about what it would probably produce, and supposed it would yield enough to pay off the previous deed of trust and also their fees, and believing this, to secure themselves, it was only necessary that Lewis should relinquish his prior lien on this wheat, and as Lewis consented to this, it was unnecessary to make any written or other agreement about the disposition of the wheat. Hence it was, I presume that no such agreement was made. But in the only binding agreement that was made, the one in writing dated June 6, 1885, nothing whatever was said about any disposition of this wheat for their benefit. Their failure to secure themselves in this compromise, it seems to me, can only be rationally accounted for by the supposition, that they thought themselves fully secured. But whatever may be their reason, it seems to me clear, that they did not get any different or better security for their fee by this compromise, than they had before it was entered into.

If then they acquire no new interest in this wheat-crop by this compromise, who is by this compromise entitled to the proceeds of this crop of wheat? They can go to no person except Lewis, the purchaser of the farm, or to Jane E. Hill

the owner of the farm before the sale. If there was no different understanding before the sale, this growing wheat-crop would as a matter of course go to the purchaser (*Crews v. Pendleton et al.*, 1 Leigh 297). But it is equally clear, if there was an understanding though not evidenced by any writing, that in case this farm was bought by Lewis, he would not get with it the wheat, but that it should be reserved, then the wheat would after the sale belong to Jane E. Hill, to whom it belonged before the sale. Now the deposition of Lewis seems to me to show clearly, that there was an understanding prior to the sale, that, when he bought this farm at the sale, he was not to have the growing wheat-crop. As a part of the compromise he agreed to relinquish his right to this wheat. In other words, so far as he Lewis was concerned, it was agreed and understood by him, that when this farm was sold by the trustee, the growing wheat-crop was reserved, so that he never did own it. The result of this would be, that it would remain as it had been, the property of Jane E. Hill and of course subject to the two deeds of trust which she had given upon it.

That this was the understanding of Lewis, when he bid upon and bought this farm is, I think, plainly shown by his deposition, though there are portions of it, which would standing by themselves seem to conflict with this view. He says, for instance, " that by the compromise he relinquished his interest in the wheat-crop, and it was a matter of no importance to him, what became of it." Is it not obvious from this, that, when he bid for and bought this farm, he understood, that he did not get with it this crop of wheat? The same is clearly implied when he says " he told Mr. Kerr that he had not bothered himself very much about the disposal of the wheat-crop; that he knew it was lost to him, and his information as to the disposal of it came from the attorneys principally." This not only shows, that he did not himself dispose of it to these attorneys, as is claimed by them, but it also shows that as he never disposed of it to any one and did not claim that he was entitled to it. He perfectly understood, that at the public sale it was not purchased by him because of his previous understanding; for he knew, that without such previous understanding he would have got this growing

wheat-crop, when he bought the farm. Again he says, "he understood, that the sale did not carry with it the growing wheat-crop, and that this growing wheat-crop and the option of redemption to Mrs. Jane E. Hill were the consideration, on account of which she consented to the sale. This shows, that he understood that a sale by a trustee would carry with it a growing crop of wheat; but he also understood, that Jane E. Hill consented to the compromise, partly because she was to have this wheat, that is, that it was not to be included in the purchase of the farm by Lewis. He says again, he was not to have the benefit of the growing crop of wheat. "My understanding was that the proceeds of the wheat-crop were to go to Messrs. Gunn and Hanly with Jane E. Hill's consent," that is, that he did not purchase it with the farm, and that Jane E. Hill, to whom it belonged, had agreed to let Gunn and Hanly have it or its proceeds. Again he says that this written paper dated June 6, 1885, contains the agreement between him and Jane E. Hill. The fact, that he did not purchase with the farm the growing wheat-crop, was not properly an agreement. It was simply an understanding by the purchaser, when he bid; and it matters not how he come to have this understanding, though he had never had a word with Jane E. Hill on the subject directly or indirectly, if the trustee on the day of sale had told him, that in buying the farm he would not buy the wheat growing thereon, as it was reserved, this would have sufficed to leave the ownership of the wheat in Jane E. Hill. And if, when the injunction suit was dismissed by Jane E. Hill, this was his understanding, that would suffice to leave the title to the wheat in her, and there can be, it seems to me, no doubt from Lewis's deposition, that this was his understanding.

It is true on his cross-examination Lewis does say, that he agreed to that disposal of the wheat-crop, that is, that it should go to Gunn and Hanly. I do not doubt that after the sale he said he had no objection to its so going; that he did not claim it, and of course did not agree to such a disposition of it in any legal sense of the word "agree." This he could only do in writing.

My opinion is that at this sale of June 6, 1885, Peter S. Lewis purchased this farm, but that he did not purchase the

wheat growing thereon, which, it was then understood by all the parties, was reserved, if he became the purchaser, and that all the parties regarded it as certain that he would become the purchaser; and that therefore the wheat remained, as it had been, the property of Jane E. Hill subject ot course to the deeds of trust upon it, which she had previously given, and which were duly recorded; that in disposing of the proceeds of this wheat-crop the court must apply them first in the manner provided by the deed of trust given by Jane E. Hill for the benefit of J. M. Kerr, the appellant, dated January 23, 1885, and any surplus, which may remain, must be applied as provided in the deed of trust given by Jane E. Hill February 17, 1885, for the benefit of the respondents in the court below and others, appellees in this Court.

The circuit court ought not in its vacation order of June 30, 1885, to have appointed Gideon Brown a special receiver to take charge of, cut, thresh and sell the said wheat, because by an act passsed in 1882 (see page 176 of Acts 1882, and Warth's Code ch. 133, sec. 28, p. 743) it is provided : "No receiver shall be appointed of any real estate or of the rents, issues or profits thereof, until reasonable notice of the application thereof has been given to the owner or tenant. *A judge of such court in vacation may appoint such receiver of any such property except real estate and the rents, issues and profits thereof.*"

To remedy this mistake the circuit court, when this cause is remanded, as it must be, should order Gideon Brown, this special receiver, to turn over to the general receiver of the court or, if there be none, to a special receiver of the court in this cause to be appointed by the court while in session as a court, any property or money, which may be in his hands, and which was received by him while acting as special receiver under his improper appointment as such. But the court should allow the said Gideon Brown out of any moneys so in his hands to retain an amount sufficient to compensate him for all costs he may have been at in cutting, threshing and selling said wheat and any other legitimate expenses, which he may have incurred while acting as such special receiver, including a reasonable compensation to him for his trouble, labor and services in the premises.

For the reasons herein assigned the decree of the circuit court of September 26, 1885, must be set aside, reversed and annulled; and the appellees, A. A. Hanly, and W. R. Gunn and J. A. Gibbons lawyers and partners doing business under the firm name of Gunn & Gibbons, W. R. Gunn individually, and W. S. VanMatre must pay to the appellant, J. M. Kerr, his costs in this Court expended; and this cause must be remanded to the circuit court of Mason county with instructions to proceed with it according to the principles and directions laid down in this opinion, and further according to the principles governing courts of equity.

REVERSED.  REMANDED.